## Case No. 8,612.

### The L. W. EATON.

[9 Ben. 289.] [1]

District Court, S. D. New York. Jan. 26, 1878.

JURISDICTION—LOCUS IN QUO—CONSTRUCTION OF STATUTE.

1. In a suit in rem, in admiralty, in the district court of the United States for the Southern district of New York, against a vessel, she was attached by the marshal on the 1st of April, 1875, under process in the suit, while she was afloat in the navigable waters of the Hudson river, lying west of Manhattan Island and to the south of the mouth of the Spuyten Duyvil creek, and where the tide ebbed and flowed, she being fastened, by means of a line, to a dock at Jersey City, in the state of New Jersey, and outside low-water mark, said wharf projecting into the navigable waters of the Hudson river lying west of Manhattan Island and to the south of the mouth of Spuyten Duyvil creek: Held, that the place where the vessel was arrested was within waters subject to the jurisdiction of said court.

[Disapproved in Hall v. Devoe Manuf'g Co., 14 Fed. 184, 185. Cited in The Norma, 32 Fed. 411.]

2. The jurisdiction of said court over said locus in quo, in such a suit, existed prior to the agreement of September 16th, 1833, between New York and New Jersey, which is set forth in the act of June 28, 1834 (4 Stat. 708), and nothing in that agreement or in that act restricted that jurisdiction.

[Cited in Malony v. City of Milwaukee, 1 Fed. 613. Disapproved in Re Devoe Manuf'g Co., 108 U. S. 417, 2 Sup. Ct. 905; Hall v. Devoe Manuf'g Co., 14 Fed. 184. 185.]

3. Sections 541 and 542 of the Revised Statutes do not have the effect to alter such jurisdiction so that it does not extend to such locus in quo.

[Disapproved in Hall v. Devoe Manuf'g Co., 14 Fed. 184, 185.]

4. The effect of the Revised Statutes enacted June 22, 1874, considered, as to altering statutory provisions in force on the 1st day of December, 1873.

[Cited in Thommasen v. Whitwill, 12 Fed. 903.]

In admiralty.

W. W. Goodrich and J. N. Whiting, for libellants.
Benedict, Taft & Benedict, for claimants.

BLATCHFORD, District Judge. This is a libel in rem, in admiralty, against the schooner L. W. Eaton. A question has arisen, the claimant having answered, as to whether the vessel was arrested within waters subject to the jurisdiction of the district court of the United States for the Southern district of New York, under the process issued herein. The parties have stipulated as follows as to the facts: "The schooner L. W. Eaton was attached by the marshal, under

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

the process issued in this cause, on the 1st day of April, 1875, the said vessel being, at the time, afloat in the navigable waters of the Hudson river, lying west of Manhattan Island and to the south of the mouth of Spuyten Duyvil creek, and where the tide ebbed and flowed, she being fastened, by means of lines, to a dock at Jersey City, in the state of New Jersey, and outside low-water mark, said wharf projecting into the navigable waters of the Hudson river lying west of Manhattan Island and to the south of the mouth of Spuyten Duyvil creek. A motion was made on behalf of the claimant to discharge the said attachment, on affidavits on file, before appearance, on the ground that said vessel was not at the time within the jurisdiction of the court, which motion was denied, and thereupon the vessel was bonded and the answer filed."

Prior to the enactment of the Revised Statutes of the United States on the 22d of June, 1874, it had been the established law of this district, that the locus in quo in this case was within the jurisdiction of the Southern district of New York, in admiralty. The question arose in the case of U. S. v. The Julia Lawrence, in this court, and was decided by Judge Betts, in May, 1860, and jurisdiction was always asserted and exercised in accordance with that decision. See The Argo [Case No. 515]. The opinion of Judge Betts has never been published at length. A synopsis of its conclusions is to be found in the New York Daily Transcript for December 6, 1871, and in 6 Am. Law Rev. 383 [Case No. 15,502]. The full text of the opinion is as follows: "The libel of information charges, that, on the 28th of September, 1858, the collector of customs of this port, on waters navigable from the sea by vessels of ten or more tons burthen, within the Southern district of New York, and within the jurisdiction of this court, seized the ship Julia Lawrence as forfeited to the use of the United States, for certain offences charged in said libel of information to have been committed by said ship against the revenue laws of the United States. The claimant of the ship filed an answer negativing each averment in the libel, and the cause was brought to hearing on the pleadings singly, as if upon an issue by demurrer to the libel for want of jurisdiction in this court over the place of seizure, it being admitted, on both sides, that the ship, when seized, was attached to a pier or dock on the New Jersey side of the river, and upon waters of the bay. It not being made to appear by the claimant, that the waters where she lay were not navigable for vessels of ten tons burthen, the averment in the libel of that fact must be deemed admitted by the pleading; and, accordingly, the locus in quo of the seizure will be within the cognizance of this court, irrespective of the territorial boundary of the state of New York, if the surface of the

waters on which she was seized was within the jurisdiction of the Southern district of New York. It may be observed, that there appears to be no restriction to the discretion of congress in respect to the territorial limits within which they may appoint the jurisdiction of the inferior courts erected by them, to be exercised. 3 Story, Const. Law, § 1591. Those courts are usually so arranged as to have their powers restricted to the particular state to which the court is assigned; but this is not invariably so, either as to the parties or subject matters of their jurisdiction. Act Feb. 28, 1839, § 1 (5 Stat. 321); Act March 3, 1849, § 5 (9 Stat. 400). Two questions are debated on this issue in law. The first regards the actual boundary line of the Southern district of New York. This was coterminous with that of the state of New York at the time the district was erected and defined (Act Sept. 24, 1789, § 2; 1 Stat. 73), when the western boundaries of the counties on the south of the state were adopted as fixing the boundary of the United States judicial district. There is, however, more distinctness of discrimination in the restatement of that boundary line in the act of April 9, 1814 (3 Stat. 120, § 1). It is not necessary to moot the question whether any variation of that line, made by assent of New York, subsequent to the establishment of the United States judicial or collection districts, would affect the dimensions and authorities of those districts, without the full concurrence of the United States government in such change, because, in my opinion, the arrangement entered into between the states of New York and New Jersey respecting their mutual boundary line, no way impairs or conflicts with any jurisdiction or power possessed by the United States under its laws preceding that adjustment, or passed in approval or confirmation of it. On the contrary, congress, in assenting to the agreement entered into between the states of New York and New Jersey, relative to the limits of those respective states, which becomes a territorial boundary upon one side of this judicial district, provides, in express terms, that 'nothing therein contained shall be construed to impair or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement.' Act June 28, 1834 (4 Stat. 711, § 1). Although, therefore, the territorial ownership or authority of New York may not now, as on the passage of the judiciary act of 1789 (1 Stat. 77, § 9; 1 Rev. St. N. Y. pt. 1, c. 1, tit. 1, § 1), embrace the whole breadth of soil to the New Jersey shore, yet the United States retain the same jurisdiction over the waters of the bay it originally possessed on the organization of its courts. The language of the judiciary act is, that the district courts shall 'have exclusive original cognizance of all civil causes of admiralty and maritime juris-

diction, including all seizures under laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts.' Act Sept. 24, 1789, § 9 (1 Stat. 77). By the subsequent act of March 2, 1799 (1 Stat. 695, § 89), the trial of any fact in issue upon such seizures is directed to be within the judicial district in which the penalty may have accrued. The observations already made sufficiently indicate the judgment of the court, that the libel of information avers facts which constitute full jurisdiction in the court over the case as described in the statute, that is, the offence was committed, and the arrest was made, on waters of the bay below low water mark on the Jersey shore of Hudson's river. An amendment of that act, by the act approved Feb. 28, 1839 (5 Stat. 322, § 3), by which it is enacted, that 'all pecuniary penalties and forfeitures accruing, under the laws of the United States may be sued for and recovered in any court of competent jurisdiction in the state or district where such penalties or forfeitures have accrued, or in which the offender or offenders may be found,' renders still more plain the purpose of congress not to restrict the jurisdiction of the court, in cases of penalties and forfeitures, to points of rigorous locality. Upon this state of the pleadings and admissions of fact, judgment must be rendered for the United States, and against the exception by the claimant to the jurisdiction of the court."

The present case is not that of a seizure for an offence against the revenue laws of the United States, as was the case of The Julia Lawrence. But the decision in that case holds that there was nothing in the agreement or compact of September 16th, 1833, entered into between the states of New York and New Jersey, respecting the territorial limits and jurisdiction of those states, and which agreement is set forth at length in the act of June 28, 1834 (4 Stat. 708), and nothing in the last named act, which limits or restricts the jurisdiction of this court over the locus in quo which is in question in this case, as such jurisdiction existed prior to the making of such agreement and to the passage of the last named act; and that, at the time of and prior to the making of such agreement, this court had the same jurisdiction over the waters of New York Bay which was conferred on the district court for the district of New York, when that court was organized in 1789, and which included jurisdiction over the waters of that bay below low-water mark on the New Jersey shore of the Hudson river and over the locus in quo in question in this case. The correctness of such decision in the particulars just named is not impugned by the claimant in the present case, but it is insisted on his behalf, that the territorial jurisdiction of this court is

altered by the Revised Statutes of the United States enacted June 22, 1874, so as not to extend to the locus in quo in this case.

By the act of September 24, 1789 (1 Stat. 73, 77, §§ 2, 3, 9), the state of New York was made one judicial district, to be called the New York district, and a court called a district court was created in that district, and exclusive original cognizance was given to such district court, of all civil causes of admiralty and maritime jurisdiction, within that district. The territorial limits of the state of New York were thereby made the territorial limits of the New York district.

By the act of April 9, 1814 (3 Stat. 120, § 1), it was enacted, that the state of New York "shall be and the same is hereby divided into two districts, in manner following, to wit: the counties of Rensselaer, Albany, Schenectady, Schoharie and Delaware, together with all that part of the said state lying south of the said above-mentioned counties, shall compose one district, to be called the Southern district of New York, and all the remaining part of the said state shall compose another district, to be called the Northern district of New York." By virtue of this act, all that part of the state of New York which was bounded on the line between New York and New Jersey fell within the Southern district of New York. By the Revised Statutes of New York (1 Rev. St. 62, pt. 1, c. 1, tit. 1, § 1), which took effect January 1, 1830, it was declared, that the boundary of the state of New York, as its jurisdiction was then asserted, ran from a point on the west side of Hudson's river, in the latitude of 41 degrees north, "southerly along the west shore, at low-water mark, of Hudson's river, of the Kill Von Kull, of the Sound between Staten Island and New Jersey, and of Raritan Bay, to Sandy Hook," "in such manner as to include * * * all the islands and waters in the Bay of New York, and within the bounds above described." Clearly, the locus in quo in this case was, by such description, within the state of New York, and it was, therefore, within the Southern district of New York. By section 3 of the act of April 3, 1818 (3 Stat. 414), the counties of Albany, Rensselaer, Schenectady, Schoharie and Delaware were transferred from the Southern district of New York to the Northern district of New York, but the boundaries of the Southern district were otherwise not altered.

The agreement or compact between the states of New York and New Jersey respecting the territorial limits and jurisdiction of said states, was entered into on the 16th of September, 1833. It was confirmed by the legislatures of the two states, and afterwards, by the act of congress of June 28, 1834 (4 Stat. 708), which sets forth the agreement at length, the consent of congress was given to the agreement. Article 1 of the agreement is as follows: "The boundary line

between the two states of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the Bay of New York. of the waters between Staten Island and New Jersey, and of Raritan Bay to the main sea. except as hereinafter otherwise particularly mentioned." Article 3 provides as follows: "The state of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the Bay of New York, and of and over all the waters of Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuyten Duyvel creek, and of and over the lands covered by the said waters, to the low-water mark on the westerly or New Jersey side thereof, subject to the following rights of property and of jurisdiction of the state of New Jersey, that is to say: * * * 2. The state of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock." The act of June 28, 1834, provides, that nothing contained in said agreement "shall be construed to impair, or in any manner affect, any right of jurisdiction of the United States in and over the islands or waters which form the subject of the said agreement."

It is apparent, that the jurisdiction of the district court for this district, in admiralty, was not affected by anything in said agreement or in the act of June 28, 1834. On the 25th of February, 1865, an act was passed (13 Stat. 438), creating the Eastern judicial district. That act provides (section 1) that "the counties of Kings, Queens, Suffolk and Richmond, in the state of New York, with the waters thereof, are hereby constituted a separate judicial district of the United States, to be styled the Eastern district of New York." It also provides (section 2) that "the district court for the said Eastern district shall have concurrent jurisdiction with the district court for the Southern district of New York, over the waters within the counties of New York, Kings, Queens and Suffolk, in the state of New York, and over all seizures and matters made or done in such waters; and all writs or other process or orders issued out of either of said courts, or by any judge thereof, shall run and be executed in any part of said waters." It is not necessary or proper to discuss in this case the question whether, under that act of 1865, the district court for the Eastern district of New York was clothed with jurisdiction over the locus in quo in the present case, or whether, in view of the provisions of the agreement between New York and New Jersey, the jurisdiction of the district court for the Eastern district of New York

was so restricted by the act of 1865, as not to extend to such locus in quo. But that act, did not take away from the district court for the Southern district the jurisdiction which it then had over such locus in quo, whether it did or did not confer such jurisdiction concurrently on the district court for the Eastern district.

On the 22d of June, 1874, the Revised Statutes of the United States were enacted. Section 530 provides as follows: "The United States shall be divided into judicial districts as follows." Section 541 provides as follows: "The state of New York is divided into three districts, which shall be called the Northern, Eastern and Southern districts of New York. The Northern district includes the counties of Rensselaer, Albany, Schoharie and Delaware, with all the counties north and west of them. The Eastern district includes the counties of Richmond, Kings, Queens and Suffolk, with the waters thereof. The Southern district includes the residue of said state, with the waters thereof." Section 542 provides as follows: "The district courts of the Southern and Eastern districts of New York shall have concurrent jurisdiction over the waters within the counties of New York, Kings, Queens and Suffolk, and over all seizures made and all matters done in such waters; and all processes or orders issued out of either of said courts, or by any judge thereof, shall run and be executed in any part of the said waters." It is contended for the claimant. that sections 541 and 542 of the Revised Statutes are to be considered as new enactments, made in 1874. with reference to the boundaries and jurisdiction of the states of New York and New Jersey as between themselves, as existing in 1874, and with reference to the agreement of 1833; and that by such new enactments there was not conferred on this court any jurisdiction over the locus in quo in this case, because, under the agreement of 1833, it is provided that the state of New Jersey shall have exclusive jurisdiction over vessels fastened to a dock on the shore of New Jersey in the place where the vessel in this case was arrested.

The revision of the statutes of the United States was initiated by the act of June 27, 1866 (14 Stat. 74), which provided that three commissioners should be appointed "to revise, simplify, arrange and consolidate all statutes of the United States, general and permanent in their nature, which shall be in force at the time such commissioners may make the final report of their doings"; "that, in performing this duty, the commissioners shall bring together all statutes and parts of statutes which, from similarity of subject, ought to be brought together, omitting redundant or obsolete enactments, and making such alterations as may be necessary to reconcile the contradictions, supply the omissions and amend the imperfections of the original text, and they shall arrange the same under titles, chapters and sections, or other suitable

divisions and subdivisions, with head-notes briefly expressive of the matter contained in such divisions, also with side-notes, so drawn as to point to the contents of the text, and with reference to the original text from which each section is compiled, and to the decisions of the federal courts explaining or expounding the same"; "that, when the commissioners have completed the revision and consolidation of the statutes, as aforesaid, they shall cause a copy of the same, in print, to be submitted to congress, that the statutes so revised and consolidated may be re-enacted if congress shall so determine, and at the same time they shall also suggest to congress such contradictions, omissions and imperfections as may appear in the original text, with the mode in which they have reconciled, supplied and amended the same, and they may also designate such statutes and parts of statutes as, in their judgment, ought to be repealed, with their reasons for such repeal." This act of 1866 was revived by the act of May 4, 1870 (16 Stat. 96), which provided that three commissioners should be appointed "to prosecute and complete the work prescribed" by the act of 1866. The commissioners were appointed, and reported to congress a "revision of the statutes," which was afterwards embodied in a bill and presented to congress. Act March 3, 1873 (17 Stat. 579). This bill became a law on the 22d of June, 1874, and is known as "Revised Statutes of the United States," and is "the revision of the statutes of a general and permanent nature." Act June 20, 1874 (18 Stat. 113, § 3). It has "marginal notes referring to the statutes from which each section was compiled and repealed by said revision." Act June 20, 1874 (18 Stat. 113), § 2. The Revised Statutes themselves are entitled, "An act to revise and consolidate the statutes of the United States in force on the first day of December, anno domini one thousand eight hundred and seventy-three." Section 5595 of the Revised Statutes, provides that the seventy-three titles which precede that section "embrace the statutes of the United States, general and permanent in their nature, in force on the 1st day of December, one thousand eight hundred and seventy-three, as revised and consolidated by commissioners appointed under an act of congress." Section 5596 provides, that "all acts of congress passed prior to said first day of December, one thousand eight hundred and seventy-three, any portion of which is embraced in any section of said revision are hereby repealed, and the section applicable thereto shall be in force in lieu thereof, all parts of such acts not contained in such revision having been repealed or superseded by subsequent acts, or not being general and permanent in their nature; provided, that * * * all acts of congress passed prior to said last-named day, no part of which are embraced in said revision, shall not be affected or changed by its enactment."

Section 541, has. as "marginal notes refer-

ring to the statutes from which it was compiled and repealed by said revision," references to section 1 of the said act of April 9, 1814, § 3 of the said act of April 3, 1818, and section 1 of the said act of Feb. 25, 1865. Section 542, has, as such marginal note, a reference to section 2 of the said act of Feb. 25, 1865.

The statutory provisions in regard to the boundaries of the Southern district of New York, and the jurisdiction of the district court for that district, which were in force on the 1st of December, 1873, were provisions general and permanent in their nature. It is clear, that it was the intention of congress to do nothing more than arrange and consolidate those provisions; that no alteration of those provisions, as a change of substance and meaning, was intended; that the provisions of sections 541 and 542 were intended to be merely compilations from the original provisions referred to in the marginal notes to those sections, and to be re-enactments of those provisions; that the provisions referred in the marginal notes to those sections, as repealed by the revision, are regarded as repealed only because they were in force on the 1st of December, 1873, and because they are embraced in those sections; and that, inasmuch as the provisions referred to in the marginal notes to those sections were general and permanent in their nature, and were in force on the 1st of December, 1873, it must be presumed that sections 541 and 542, re-enact them, with the meaning and interpretation which they had received prior to that day, and which were understood on that day to appertain to them. Undoubtedly, where the language of any section of the Revised Statutes, is so clearly different from the language of any prior provision referred to in the marginal note to such section, as to make it impossible to give to the new language the same meaning and interpretation which were given to the former language, the new language must receive a different meaning and interpretation. But the presumption is against any intention that new language should have a different meaning and interpretation. The presumption is that the new language is the result merely of revision, simplification, rearrangement and consolidation. with a view to the re-enactment of the same substance and meaning. Moreover, in the present case, the act of June 28, 1834, is still in force, unaffected by the Revised Statutes. It was not a "general" act, in the sense of that word, as used in section 5596, no part of it is embraced in any section of the revision, no section of the revision is in force in lieu of any part of it, and, therefore, the provisions of that act are not affected or changed by the enactment of the Revised Statutes. The material provision of that act is, that the agreement between New York and New Jersey shall not be construed to impair or in any

manner affect any right of jurisdiction, then existing, of the United States, in and over the waters which form the subject of the said agreement. The act of 1834, must be read in connection with sections 541 and 542 of the Revised Statutes, and all must be so construed that all may stand. Thus construing those sections, the limits of the "state" of New York, and of the "counties" thereof, and of "the waters thereof," must, so far as the jurisdiction of the district court for the Southern district of New York, in admiralty, is concerned, be construed to be the limits recognized prior to the making of said agreement between New York and New Jersey, and not any limits created by said agreement.

The views above announced are sanctioned by the opinion of the supreme court, in Murdock v. City of Memphis, 20 Wall. [87 U. S.] 590, 617, where it is said, that the revision of the statutes of the United States, passed in 1874, is "based upon the idea that no change in the existing law should be made," and also by its opinion in Smythe v. Fiske, 23 Wall. [90 U. S.] 374, where it is said that "it was the declared purpose of congress to collate all the statutes as they were" on the 1st of December, 1873, "and not to make any change in their provisions." The same views were applied by this court in its opinion in the case of U. S. v. Claflin [Case No. 14,799], and those views were concurred in by the circuit judge, in his opinion in the same case in the circuit court, on writ of error (ut supra).

It results, that the vessel in this case was arrested within waters subject to the jurisdiction of this court, under the process issued herein. ·